[Cite as *State v. Morrow*, 2011-Ohio-5797.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. William B. Hoffman, P.J. |
|  | : | Hon. Sheila G. Farmer, J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
|  | : |  |
| v. | : |  |
|  | : | Case No. 2010CAA100082 |
| JAMES MORROW | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:       Criminal Appeal from the Delaware County
                               Court of Common Pleas, Case No.
                               10-CR-I-08-461

JUDGMENT:                      Affirmed

DATE OF JUDGMENT ENTRY:        November 7, 2011

APPEARANCES:


For Plaintiff-Appellee                    For Defendant-Appellant

CAROL HAMILTON O'BRIEN                    BRIAN G. JONES
Delaware County Prosecuting Attorney      Law Offices of Brian Jones
                                          2211 U.S. Highway 23 North
DOUGLAS DUMOLT                            Delaware, OH 43015
Assistant Prosecuting Attorney
140 North Sandusky Street, 3rd Floor
Delaware, OH 43015

*Hoffman, P.J.*

{¶ 1} Defendant-appellant James Morrow appeals his conviction and sentence entered by the Delaware County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶ 2} On May 23, 2010, Appellant and Brad Dunay visited the home of Robert Croy, a seventy-three year-old acquaintance of Dunay.

{¶ 3} The next morning, May 24, 2010, Appellant returned to Croy's home. Croy believed Appellant had returned with some DVD's to sell at a yard sale. However, when Croy opened the door, Appellant put a knife to Croy's neck and ordered him into a bedroom. Appellant then demanded Croy give him all of his money. Croy produced some money from his back pocket and retrieved a black fanny pack containing approximately $5,700.

{¶ 4} Appellant then dragged Croy to a bathroom by his shirt collar. Once in the bathroom, Appellant had Croy open a safe. When no additional money was found, Appellant pushed Croy to the floor and bound his hands with drawstring from a nearby sweatshirt. As Appellant left the bathroom, he slammed the door shut, trapping Croy in the bathroom as the door had no interior door knob.

{¶ 5} At trial, the State presented several witnesses who testified Appellant had told them he robbed an "old drug dealer" and had received approximately $6,000. The State further presented witnesses who saw Appellant with a black fanny pack. Specifically, Jennifer Tiller testified Appellant gave a black fanny pack to her step-father Martin Keifer. Martin Keifer testified Appellant gave him a black fanny pack. A black

fanny back was later found in Martin Keifer's belongings, and Croy then identified the black fanny pack as the one containing the money Appellant stole from his residence.

{¶ 6}  On September 9, 2010, Appellant was convicted of aggravated burglary, in violation of R.C. 2911.11(A) ; aggravated robbery, in violation of R.C. 2911.01(A)(1); kidnapping, in violation of R.C. 2905.01(B)(1); kidnapping, in violation of R.C. 2905.01(B)(2); robbery, in violation of R.C. 2911.02(A)(1), theft, in violation of R.C. 2913.02(A)(1); and possession of criminal tools, in violation of R.C. 2923.24(A).

{¶ 7}  The trial court sentenced Appellant to a ten year prison term on the aggravated robbery charge, and a four year prison term to be served consecutively on the second kidnapping charge.  The trial court also imposed a five year term of mandatory post-release control.  Appellant now appeals, assigning as error:

{¶ 8}  "I. APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THERE WAS NOT ENOUGH CREDIBLE, COMPETENT EVIDENCE TO SUPPORT THE GOVERNMENT'S ALLEGATIONS.

{¶ 9}  "II. APPELLANT WAS DENIED THE RIGHT TO PRESENT A DEFENSE THROUGH CROSS EXAMINATION AND CONFRONTATION UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 10 OF THE OHIO CONSTITUTION WHEN THE TRIAL COURT PRECLUDED TRIAL COUNSEL FROM INQUIRING INTO THE COMPLAINING WITNESS'S MOTIVE'S TO LIE.

{¶ 10} "III. APPELLANT WAS DENIED DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION 16 OF THE OHIO CONSTITUTION AND ARTICLE I SECTION

10 OF THE OHIO CONSTITUTION WHEN THE TRIAL COURT IMPOSED SENTENCES FOR BOTH AGGRAVATED ROBBERY AND KIDNAPPING."

I.

{¶ 11} In the first assignment of error Appellant contends his convictions are against the manifest weight of the evidence as there was not enough credible, competent evidence to support the State's allegations. Specifically, Appellant questions the credibility of the State's witnesses.

{¶ 12} Appellant cites the testimony of Croy wherein he states Appellant and Dunay never returned to his home on the 24th; however, Dunay testified he and Appellant went back to Croy's later in the evening on the 24th to get more money for video games. Appellant also contends Croy gave him $900 on the second visit to purchase cocaine. Further, Appellant raises issues with regard to the credibility and reliability of the testimony of other witnesses due to their felony convictions and propensity for dishonesty.

{¶ 13} Manifest weight of the evidence claims concern the amount of evidence offered in support of one side of the case. We must determine whether the jury, in interpreting the facts, so lost its way that its verdict results in a manifest miscarriage of justice, *State v. Thompkins* (1997), 78 Ohio St.3d 387, 678 N.E.2d 541, 1997–Ohio–52, superseded by constitutional amendment on other grounds as stated by *State v. Smith,* 80 Ohio St.3d 89, 1997–Ohio–355, 684 N.E.2d 668. On review for manifest weight, a reviewing court is "to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest

miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." *State v. Thompkins,* supra, 78 Ohio St.3d at 387, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1; See also, *State v. Bell*, 2006-Ohio-6560.

{¶ 14} Robert Croy testified at trial:

{¶ 15} "Q. Now, when he came into your - - came up to your door, did you open the screen door or did he open the screen door?

{¶ 16} "A. I put the latch on, unlocked it and he opened it.

{¶ 17} "Q. And what happened next?

{¶ 18} "A. He put a knife at my throat.

{¶ 19} "Q. Do you know if it was a small knife or a large knife?

{¶ 20} "A. He said, 'Don't look at the knife; don't look at me or I'll cut your throat.'

{¶ 21} "Q. And what was his - - I assume he had a knife in one hand or was it in two?

{¶ 22} "A. He had one.  I was wearing this shirt that day.  He grabbed the back of my shirt and he never let go the whole time he was there.  He never took the knife away from my throat.

{¶ 23} "Q. So describe what happened when he takes you inside?

**{¶ 24}** "A. He shoves me into my bedroom and says, 'I want all your money, I want it now or I'm going to cut your throat'.

**{¶ 25}** "Q. So what did you do when he demanded the money?

**{¶ 26}** "A. I gave it to him; told him where it was at.

**{¶ 27}** "Q. And where was it?

**{¶ 28}** "A. Under my pillow.

**{¶ 29}** "Q. Can you point on the diagram where it was?

**{¶ 30}** "A. (Indicating).  Under my pillow.

**{¶ 31}** "Q. So you give him the money.  What was it in at the time?

**{¶ 32}** "A. I gave him the fanny pack and everything that that I had that wasn't in my pockets.

**{¶ 33}** "Q. So what happens next?

**{¶ 34}** "A. He asked if I had any other money.  And I said, 'Yes, in my pants pocket.'  I pulled that out and I gave that to him.  And I had change in my right pocket and he says, 'I don't want the damn change.'

**{¶ 35}** "Q. What happened next?

**{¶ 36}** "A. He drags me to the bathroom, takes like a black rope out of a sweatshirt, a black hooded sweatshirt and ties me up with it.  Before he done that, he made me open the safe that had my army discharge and everything like that is in the safe.  He thought there was money there.  So he made me open that.

**{¶ 37}** "Q. So where are the safes located?

**{¶ 38}** "A. Sitting on top of a black file cabinet I had in my bathroom.

**{¶ 39}** "Q. And what did you normally keep in your safes?

**{¶ 40}** "A. In that safe, I had army discharge papers, numerous watches, miscellaneous items special for me.

**{¶ 41}** "* * *

**{¶ 42}** "Q. So he takes you into the bathroom and he orders you to open the safe. What happens then at that point?

**{¶ 43}** "A. He seen that there wasn't anything there.  So he throwed [sic] me down on the floor and took the black tie out and proceeded to tie me up.

**{¶ 44}** "Q. Now, were you still in the bathroom at that point when he tied you up.

**{¶ 45}** "A. Yes, on the floor.

**{¶ 46}** "Q. Was the sweatshirt in the bathroom at that time or did he bring it from somewhere else?

**{¶ 47}** "A. It belongs beside the bathtub.  There's a clothes line that's across the tub and it was hanging up there.  The string had come out and it was lying on the floor. So that was the handiest thing he could find, you know.

**{¶ 48}** "* * *

**{¶ 49}** "Q. Now after you where [sic] tied up in your bathroom, what happened next?

**{¶ 50}** "A. I didn't hear any sounds or anything, so I immediately proceeded to try my best to get loose.  When I got loose - - it took me a while to get up off the floor and get a hold of something to stand upright.  And I took a chance and opened the bathroom door and there was nobody in the house that I could see.  So I proceeded to get an old cell phone I had and called 911.  He had stole mine from the side of my bed so I couldn't use it."

{¶ 51} Tr. at 66-72.

{¶ 52} The State then presented the testimony of Amber Steiner Appellant's ex-wife who testified Appellant told her he had "ganked a drug dealer and took drug money" in the amount of "six thousand dollars," and he was going back to prison.  Tr. at 110.

{¶ 53} Kisten Mathis testified at trial in May of 2010 Appellant called her and asked her to pick him up to return a van.  Tr. At 122.  She picked him up at a Super 8 Motel, dropped off the van and then took Appellant to Walmart.  Id.  At the Walmart, Appellant told Mathis he "robbed a drug dealer."  Tr. at 123.  He told her "he tied him up and he hit him," and "he got six grand."  Tr. at 123.  When they left Walmart, Appellant got out of the car and threw his cell phone down into a sewer.  Tr. at 124.  At the Walmart the phone kept ringing, and Appellant told Mathis, "They're probably trying to find me, trying to find where I'm at because I took this phone."  Tr. at 124.  She then testified to seeing Appellant with the "exact same" fanny pack as that introduced at trial. Tr. at 128.

{¶ 54} Similarly, Jessica Aldridge testified Appellant told her "he went to somebody's house and he had seen a money and he had beat the guy up pretty well and he took the money and it had six thousand dollars in it and he left." Tr. at 142.

{¶ 55} Jennifer Tiller, with whom Appellant resided, testified to seeing a black fanny pack in his laundry basket on top of the dryer. Tr. at 158.  She testified Appellant told her he had robbed a drug dealer and had gotten six thousand dollars.  Tr. at 158. She then testified Appellant gave the fanny pack to her step father.  Tr. at 159-160.

{¶ 56} Based upon the above mentioned in support of Appellant's conviction, we do not find Appellant's conviction was against the manifest weight of the evidence.

{¶ 57} The first assignment of error is overruled.

II.

{¶ 58} In his second assignment of error, Appellant maintains he was denied the right to present a defense and to cross-examine and confront witnesses when the trial court precluded him from inquiring into the complaining witnesses' motive to lie. Specifically, Appellant cites the trial court's sustaining objections to evidence relating to Croy's indictments and related behavior on at least four occasions.

{¶ 59} Initially, we note the admission or exclusion of relevant evidence is within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173.

{¶ 60} First, Appellant cites the trial court's exclusion of testimony relating to money allegedly seized by the Delaware County Drug Task Force:

{¶ 61} "Q. Now, there was also some money you had that wasn't in your possession; right?

{¶ 62} "A. Pardon?

{¶ 63} "Q. There was also a large amount of money that wasn't in your possession on that day?

{¶ 64} "A. That wasn't in my possession?

{¶ 65} "Q. Yes.

{¶ 66} "A. I wouldn't know anything about that.

{¶ 67} "Q. Did the Delaware County Task Force - - -

{¶ 68} "Ms. O'Brien: Objection.

{¶ 69} "The Court: Approach.

{¶ 70} (Side-bar conference as follows.)

{¶ 71} "The Court: What is your objection.

{¶ 72} "Mr. Dumolt: Your Honor, that's what we talked about before with the indictment.

{¶ 73} "The Court: Okay.

{¶ 74} "Mr. Dumolt: It's going to the fact that the money was forfeited. It was physically forfeited. He's trying to talk about the money that's in the indictment, the possession of the Delaware County Task Force.

{¶ 75} "Mr. Cornely: He said that was all the money he had.

{¶ 76} "Mr. Dumolt: You can't prove that, and you're stuck with the - - -

{¶ 77} "The Court: What's the date of that? This is September '09.

{¶ 78} "Mr. Cornely: The indictment May 23rd and it hasn't been resolved. He said that's all the money he had, your honor.

{¶ 79} "The Court: Do you want to argue this to the jury or me, John?

{¶ 80} "Mr. Cornely: Sorry.

{¶ 81} "The Court: I'll sustain the objection.

{¶ 82} (Side-bar completed)."

{¶ 83} Tr. At 90-91.

{¶ 84} Ohio Evidence Rule 404(B) provides,

{¶ 85} "Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

**{¶ 86}** Upon review of the record Appellant has not demonstrated the relevance of the evidence. It is not evident from the record the trial court abused its discretion in excluding the testimony, and Appellant has not demonstrated otherwise.

**{¶ 87}** Appellant's second citation refers to Appellant's trial counsel questioning Croy as to whether he ever traded drugs for money. Tr. at p. 97. The trial court allowed Croy to answer the question, but sustained the objection when counsel asked Croy whether he was ever charged with selling drugs.

**{¶ 88}** The third and fourth occasions reference Appellant's testimony Croy is "one of his dudes that kind of gets…" and Croy's selling things at yard sales and trading things for drugs.

**{¶ 89}** Upon review of the testimony in its entirety, we find the trial court did not abuse its discretion in excluding the testimony cited by Appellant. The trial court herein did allow testimony to establish Croy had a history in dealing drugs. As set forth in the testimony cited in the analysis and disposition of the first assignment of error, numerous references were made to Appellant's robbing a "drug dealer." Appellant had ample opportunity throughout the trial to establish Croy was a drug dealer, and his theory of the case centered on the victim attempting to purchase drugs from him. Assuming, arguendo, it was error to exclude the aforementioned testimony, we find Appellant has not demonstrated prejudice as a result thereof.

**{¶ 90}** The second assignment of error is overruled.

III.

{¶ 91} In the third assignment of error, Appellant asserts the trial court erred in sentencing him on both the aggravated robbery and kidnapping charges as they are allied offenses of similar import.

{¶ 92} Ohio Revised Code 2941.25 provides,

{¶ 93} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

{¶ 94} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶ 95} Recently, the Ohio Supreme Court, in *State v. Johnson,* 128 Ohio St.3d 1405, 2010–Ohio–6314, modified the test for determining whether offenses are allied offenses of similar import. In *Johnson,* the Ohio Supreme Court directed us to look at the elements of the offenses in question and determine whether or not it is possible to commit one offense and commit the other with the same conduct. If the answer to such question is in the affirmative, the court must then determine whether or not the offenses were committed by the same conduct. If the answer to the above two questions is yes, then the offenses are allied offenses of similar import and will be merged. If, however, the court determines that commission of one offense will never result in the commission

of the other, or if there is a separate animus for each offense, then the offenses will not merge according to *Johnson,* supra.

{¶ 96} Appellant was convicted of aggravated robbery, in violation of R.C. 2911.11, which reads:

{¶ 97} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

{¶ 98} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

{¶ 99} "(2) Have a dangerous ordnance on or about the offender's person or under the offender's control;

{¶ 100} "(3) Inflict, or attempt to inflict, serious physical harm on another."

{¶ 101} Appellant was further convicted of kidnapping, in violation of R.C. 2905.01(B)(2):

{¶ 102} "(B) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim or, in the case of a minor victim, under circumstances that either create a substantial risk of serious physical harm to the victim or cause physical harm to the victim:

{¶ 103} "(1) Remove another from the place where the other person is found;

{¶ 104} "(2) Restrain another of the other person's liberty."

{¶ 105} The record indicates Appellant entered Croy's residence, held a knife to his throat, and forced him to the bedroom. Appellant demanded, "I want all your money, I want it now, or I am going to cut your throat." Appellant then received the $5,700 in cash Croy had in his bedroom. At this point in the series of events, Appellant had committed aggravated robbery. Appellant then led Croy to the bedroom and forced him to enter the safe, which he found did not contain money. However, Appellant then takes the separate act, which is unnecessary to the commission of the already completed aggravated robbery, of binding Croy with the cord of a sweatshirt. He then leaves Croy on the floor of the bathroom, and slams the door shut with no handle on the inside, and exiting the residence with Croy's phone. We do not find the trial court erred in finding Appellant's commission of aggravated robbery and kidnapping were not allied offenses of similar import under the facts and circumstances as presented in this case.

{¶ 106} The third assignment of error is overruled.

{¶ 107} For the reasons set forth above, Appellant's conviction and sentence in the Delaware County Court of Common Pleas are affirmed.

By: Hoffman, P.J.

Farmer, J., and

Wise, J. concur

s/ William B. Hoffman_____
HON. WILLIAM B. HOFFMAN


s/ Sheila G. Farmer_____
HON. SHEILA G. FARMER


s/ John W. Wise_____
HON. JOHN W. WISE

[Cite as *State v. Morrow*, 2011-Ohio-5797.]

IN THE COURT OF APPEALS FOR DELAWARE COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| | : | |
| v. | : | JUDGMENT ENTRY |
| | : | |
| JAMES MORROW | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 2010CAA100082 |

For the reasons stated in our accompanying Opinion, Appellant's conviction and sentence in the Delaware County Court of Common Pleas are affirmed. Costs to Appellant.

s/ William B. Hoffman _____
HON. WILLIAM B. HOFFMAN


s/ Sheila G. Farmer _____
HON. SHEILA G. FARMER


s/ John W. Wise _____
HON. JOHN W. WISE